166 So.2d 798 (1964)
Lucius B. JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
No. 4672.
District Court of Appeal of Florida. Second District.
July 24, 1964.
Rehearing Denied September 1, 1964.
*799 Paul Antinori, Jr., of Antinori & Cazin, Tampa, for appellant.
James W. Kynes, Atty. Gen., Tallahassee, and Robert G. Stokes, Asst. Atty. Gen., Lakeland, for appellee.
ALLEN, Acting Chief Judge.
Appellant, convicted of assault with intent to commit rape, challenges his conviction on two grounds, an alleged insufficiency of evidence and alleged error in the admission of certain testimony by a State's witness. We have examined the transcript of the proceedings below and conclude that the first challenge to the judgment is without merit: the lower court did not err in submitting the cause to the jury and the record reveals evidence sufficient to justify the jury's verdict and the consequent conviction.
The second challenge to the conviction, based upon alleged error in the admission of testimony by a prosecution witness, arises from circumstances wherein, after adducing evidence as to the facts of the incident giving rise to prosecution and the fact of appellant's arrest, the State called one David F. Allison to the stand. After indicating his name, address and the fact that he recognized the defendant-appellant, Allison was asked if he had conversed with the defendant on a certain date subsequent to the alleged assault. The attorney for defendant-appellant who incidentally was counsel not associated with the firm now representing appellant, objected to the last inquiry and, after establishing that Allison had no official police capacity, grounded his objection on Allison's not being a representative of a governmental law enforcement agency. This objection was overruled, Allison answered affirmatively and the inquiry turned to the substance of the conversation.
*800 In response to questions by the prosecution, Allison indicated that he was referring to notes of his conversation with appellant, including "direct quotes," which notes, he added, were used in making his "final report." Asked what appellant had said, Allison responded "Originally * * * [the defendant-appellant] stated that he had told the full and entire truth." Again, the defense objected, the jury was withdrawn and, through colloquy between the court, the attorneys and the witness, it was revealed that Allison was a polygraph or "lie detector" operator. The defense argued that by reason of this fact his testimony would be prejudicial and inadmissible. The following excerpt from the transcript, made while the jury was out, summarizes the dispute and its resolution.
"MR. STAGG [for the prosecution]:
Now, we propose to offer simply what this man told Mr. Allison, Judge, which would be in the nature of admissions. But we do not propose to go into the results of the lie detector test, even though that is what he does, or even that one was given, or even that he owns a lie detector machine. Only what was said as a conversation between them. We have a number of cases that we can cite to the Court if there is any question of the admissibility of confessions made.
"THE COURT: All right. Mr. Menas, what is your objection?
"MR. MENAS [for the defense]: My objection will be in this form. To allow Mr. Allison to testify at this time will allow the State to do something indirectly which they cannot do directly, to-wit, to introduce the lie detector test, or testimony. It would be the same thing. It would be just as damaging as the evidence of the lie detector test itself.
"Now, that's my objection, your Honor please. I vigorously object to it.
"THE COURT: All right. Now, the objection will be overruled but I want it clear that the testimony of this witness will be confined to exactly what you stated that you intend to offer by the witness."
The jury was brought in and Allison, testifying as to his conversation with appellant, said:
"A. It was with reference to information regarding an incident that occurred, allegedly, near the Hillsborough River, two days before, on April 4th at about three O'clock in the afternoon, approximately. In talking with Mr. Johnson, he denied any knowledge of it, whatsoever. He denied being in that vicinity at all on that date and, particularly, at that time. When I told him that I did not believe him, which I did, he, in turn, stated that he could not admit anything, that if he did admit anything he would lose his church papers. * *
* * * * * *
"A. [We] continued our conversation and in a short while, Mr. Johnson admitted that he had not told me the truth."
Continuing, Allison testified to further conversation in which appellant admitted his presence at the scene of the incident but gave an exculpatory explanation of the events that ensued.
On cross-examination and in direct response to defense counsel's questions, Allison testified that his conversation with appellant eventuated from a police request that he administer a polygraph examination. However, although the defense introduced this fact to the jury, the court subsequently foreclosed any further exploration of the subject of a polygraph examination by the State on redirect examination.
The appellant now urges that since he subsequently testified in the case, denying the assault, his credibility was a vital issue and that "if the jury were allowed to hear directly *801 or by implication the results of a polygraph test, then such testimony, being inadmissible, was prejudicial, harmful and reversible error." Appellant argues that the fact that Allison testified from notes he said were used in "making a final report" and the fact that though not a police official he nonetheless questioned the witness, coupled with Allison's allusions to "believing" the defendant and to the discussion of "truth" with defendant, all served to indicate to the jury that Allison was a "lie detector expert." He concludes that Allison testifying for the State indirectly and implicitly conveyed an impression of an adverse polygraph examination of appellant. Appellant's counsel on appeal discreetly avoids mentioning that if the jury hadn't concluded that Allison was a polygraph operator, appellant's trial counsel made it clear to them.
Upon consideration of appellant's arguments and of the circumstances surrounding the direct examination of the witness Allison, we conclude, for reasons hereinafter discussed, that the court did not err in permitting Allison to testify.
Initially we cannot agree that the jury must have known Allison was a polygraph operator prior to the disclosure of this fact by the defense. The substance of his testimony with respect to the conversation with appellant, including the testimony of appellant's initial assertion of veracity, Allison's challenging this and appellant's retreat and eventual contradictory admissions do, we agree, indicate that Allison was interested in arriving at truth, but this is an interest not unique to a polygraph examiner. In any interrogation or conversation relative to an alleged crime, the participants are presumably seeking to establish the truth as to circumstances. The additional disclosures that Allison was refreshing his recollection from notes he used in making a report to undisclosed persons and that Allison was not a police or prosecution official, (the latter fact having been disclosed at defendant's insistence) do not alone or in connection with his testimony impel nor justify the conclusion that the witness was a polygraph operator. Indeed, the record, in our view, demonstrates scrupulous care on the State's part to prevent the jury's reaching the conclusion appellant urges they must have reached.
However, even were we to conclude that the jury did or reasonably could have realized that Allison was a polygraph operator on the basis of the State's examination, this would not impel the conclusion that his testimony was inadmissible. The established rule that neither the result of a polygraph examination nor any allusion to such an examination to imply a certain result is admissible or proper, Kaminski v. State, Fla. 1953, 63 So.2d 339, does not, in our view, label the polygraph a tree whose every fruit is forbidden.
In Florida, and in every other jurisdiction in the United States that has considered the question, the results of so-called lie detector examinations are generally not admissible as evidence and should be excluded upon objection of any party. Kaminski v. State, supra; Annot. 23 A.L.R. 1306 (1952) and supplements. However, Justice Udall, in a logical and comprehensive opinion for the Arizona Supreme Court in State v. Valdez, 91 Ariz. 274, 371 P.2d 894 (1962), enunciates the view that the results of an examination can be admitted, at the trial judge's discretion and upon proper instruction to the jury, when the parties stipulate to the admission.
As a consequence of the bar to direct proof of veracity by introduction of lie detector results, attempts were made to accomplish the prohibited end by indirection. These attempts gave rise to a derivative prohibition against inquiry as to the willingness or reluctance of a party or witness to be the subject of a lie detector examination. Courts which considered this issue almost universally determined that a witness' veracity could not be bolstered nor discredited by proof of his taking or refusing a lie detector test and that evidence of a defendant's willingness or reluctance to be examined was inadmissible to prove consciousness *802 of innocence or of guilt. People v. Carter, 48 Cal.2d 737, 312 P.2d 665 (1957); Mills v. People, 139 Colo. 397, 339 P.2d 998 (1959); State v. Emory, 190 Kan. 406, 375 P.2d 585 (1962); State v. Kolander, 236 Minn. 209, 52 N.W.2d 458 (1952); Commonwealth v. Saunders, 386 Pa. 149, 125 A.2d 442 (1956); State v. Britt, 235 S.C. 395, 111 S.E.2d 669 (1959).
An early decision on this issue was found in the opinion of Florida's Supreme Court in Kaminski v. State, supra, wherein the Court concluded that it was error to permit the State to attempt rehabilitation of its witness by proving he had willingly submitted to a lie detector test. The Court reasoned that this tactic placed the defense in the untenable position of either making further inquiry into the subject and result of the test (thereby being forced to adduce potentially damaging evidence that was clearly incompetent) or of suffering the effect of the jury's inferring results favorable to the witness' veracity and the State's case. A full discussion of the Kaminski case and analogous authority is found in the more recent case of State v. Mottram, 158 Me. 325, 184 A.2d 225 (1962).
However, while neither party should be permitted to allude to a witness or a defendant having taken a lie detector test, a defendant who initiates the inquiry, without objection from the State, and attempts to prove consciousness of innocence, cannot then complain when the State (unsuccessfully) attempts to pursue the subject. People v. Parrella, 158 Cal. App.2d 140, 322 P.2d 83 (Cal. App. 1st Dist. 1958). But see People v. Adams, 182 Cal. App.2d 27, 5 Cal. Rptr. 795 (Cal. App.2d Dist. 1960).
The instance of "invited error" in the Parrella case, wherein the jury was apprised of the fact that defendant took a lie detector test but was foreclosed from consideration of the results as proof, is but one of numerous instances wherein mere allusion to a "lie detector" without further pursuit of the subject or an affirmative attempt to directly or indirectly prejudice an opposing party has been viewed as harmless.
Perhaps the most frequent instances of a jury being advised of a defendant's having taken a lie detector test are in cases involving confessions or admissions procured in anticipation of, during or subsequent to administration of a lie detector examination. It is well established that the mere fact that a lie detector examination may have been involved in procuring a confession does not render the confession inadmissible. People v. McHenry, 204 Cal. App.2d 764, 22 Cal. Rptr. 621 (Cal. App.3d Dist. 1962); State v. Traub, 150 Conn. 169, 187 A.2d 230 (1962); Commonwealth v. Jones, 341 Pa. 541, 19 A.2d 389 (1941). See Richardson Modern Scientific Evidence §§ 10.7-10.10 (1961). However, if the defendant is forced to submit to the examination or if the methods of examination are such as to constitute actual or psychological coercion the resulting confession may well be found involuntary. A case in point, People v. Sims, 395 Ill. 69, 69 N.E.2d 336 (1946) involved a question of the admissibility of admissions made by a 17 year old defendant who had been questioned with lie detector apparatus attached to her. Rejecting this evidence, the Court wrote:
"* * * The testimony is that while the lie detector was still attached to plaintiff in error, but was not operating, a statement, * * * was taken. This statement was introduced in evidence, though the questions asked and the answers given when the lie detector was operating were not introduced in evidence. There is nothing in the evidence to indicate that plaintiff in error knew that the lie detector was not in operation when the * * * statement * * * was taken or that she was not influenced by the fact that the apparatus was still attached to her body. Evidence of State's witnesses showed that she objected to the use of the lie detector. She was without the advice of counsel and it seems probable that a girl of her age supposed, as she *803 said, that because of the use of the lie detector and the fact that it was attached to her she was required to make a statement. We are of the opinion that what was done amounted, under the circumstances of this case, to a use of the lie detector against her wishes. No court, so far as we are advised, has ever held that a lie detector may be used on the accused without his consent. * * *"
Necessarily, when a confession procured during or as a result of a lie detector examination is challenged, the facts surrounding the confession will be disclosed. If the court determines the evidence competent, these same facts  including the fact that the defendant was subjected to a lie detector  may be disclosed to the jury as bearing on the confession's credibility. See People v. McHenry, supra, Traub v. State, supra. State v. DeHart, 242 Wis. 562, 8 N.W.2d 360 (1943). Indeed, it has been held error to limit defense efforts to explore the details of a lie detector examination eventuating in a confession. People v. Lettrich, 413 Ill. 172, 108 N.E.2d 488 (1952).
In Tyler v. United States, 193 F.2d 24 (D.C. Cir.1951) cert. denied 343 U.S. 908, the prosecution introduced a confession and in so doing adduced evidence as to the circumstances surrounding the confession. It appeared that the defendant Tyler agreed to take a lie detector examination and was taken to a polygraph expert, Captain Curley.
"According to the Government's proof Curley advised Tyler he did not have to take the test and should not do so unless he thought he could be cleared. Tyler expressed his willingness. Curley testified that he then explained `all of the techniques of the examination so that he [Tyler] would be fully aware of what was going to happen.' Further, Curley testified:
"`* * * I ran one examination at which time I stopped the machine, the examination was four minutes long, and I advised William Tyler that we could not continue with the test unless he really desired to cooperate. He attempted to, what we call, beat the machine by abnormal breathing, and so distorting the chart.
"`I told him that unless he really wanted to continue with the test, we couldn't do it.'
* * *
"`* * * He admitted that he had been taking deep breaths and he decided that he would like to continue with the test.
"`* * * We ran another test about 11 minutes. At the end of that test I stopped the machine and advised William Tyler of the reactions that I received. He stated at that time that he didn't want to take any more of the test.
"`I advised him that the reactions were indications that he was lying to me, and for him not to continue unless he was going to be able to tell me the truth.
"`* * * He stated that he didn't want to take the test any longer and for me to take the blood pressure cuff and electrodermal unit off of him.
"`* * * after a while I spoke to him about the test, it was approximately an hour  he stated that he did do this thing and that he would like to make a statement about it.'
* * *
"`* * * He stated that he wished to make a complete statement of the Langsburgh killings, and that he would like to have Detective Furr brought in in order to make the statements to him.'" (193 F.2d at 26)
*804 Answering defense arguments that the submission of the above to the jury was prejudicially erroneous, the Court said:
"During the testimony of Captain Curley, counsel for Tyler moved at the bench to strike the same, especially that part covering Curley's statement to Tyler that the lie detector machine indicated he was lying. The court denied the motion, adopting the view that the testimony was relevant as revealing circumstances leading to the confession, although not as proof of the correctness of Curley's statement. So the jury would at once understand, the court suggested that counsel restate his motion in open court. This was done. Whereupon the court denied the motion, and informed the jury that, `The statement of the witness that he told the defendant that the machine indicated he was lying is not admitted as evidence of any alleged lying of the defendant, but merely as evidence bearing upon the question whether the confession was, in fact, voluntary.' We think the ruling was correct. This court has held the results of a lie detector test to be inadmissible. Frye v. United States, 1923, 54 App.D.C. 46, 293 F. 1013. We do not mean to impair that ruling. But here the circumstances are different. The evidence had a material bearing upon the conditions leading to Tyler's confession and was relevant upon the vital question as to whether the same was voluntary. With the court's clear and positive instruction to the jury, holding the evidence within proper bounds, and the presumption that the instruction was followed by the jury, we are not warranted in assuming that any prejudicial results followed from the incident. Moreover, in view of the later confessions, which the jury doubtless accepted as true, and which necessarily implied an admission by Tyler that his earlier denials of guilt were false, obviously no prejudice could finally have resulted from the testimony. Then too, the testimony did not reveal the nature of Curley's questions or of Tyler's answers. So there was nothing to indicate to the jury what particular statements Curley had reference to when he told Tyler there were indications he was lying." (Emphasis added, 193 F.2d at 31.)
Whereas the court in the Tyler case, for reasons set out in the emphasized portions of their opinion aforequoted, found the testimony concerning the examination not erroneously prejudicial, a different finding obtained in Leeks v. State, 245 P.2d 764, (Crim.Ct.App.Okla. 1952), where detailed testimony as to defendant's lie detector examination was found to have created inferences as to the results of the examination contrary to the rule against their admissibility. As distinct from Tyler, the Leeks case involved none of the precautions against the jury considering the results of the test and involved testimony attempting to bolster an unwritten confession by inferences as to test results, rather than merely testimony explaining the physical circumstances surrounding the confession. See too State v. Varos, 69 N.M. 19, 363 P.2d 629 (1961).
The mere fact that a jury may be aware of defendant's having taken a lie detector test or may be apprised of facts from which they might infer such a fact is not error when the results of the test are not thus indirectly introduced. Moody v. State, 170 Tex.Cr.R. 637, 343 S.W.2d 698 (1961); People v. Sammons, 17 Ill.2d 316, 161 N.E.2d 322 (1959); People v. Flowers, 14 Ill.2d 406, 152 N.E.2d 838 (1958).
The Flowers case is similar to the case sub judice in that statements obtained after a lie detector test were admitted into evidence and the examiners testified to the fact that the statement was given by the defendant. However, unlike the instant case where inference is urged as the basis for the jury's conclusion that the witness *805 was a polygraph operator, the Flowers case involved a direct statement to that effect by the witness. The Illinois Court wrote:
"It is nowhere suggested in the evidence before the jury in this case that the defendant submitted to a lie-detector test, or that this statement was obtained in preparation for such a test. One of the examiners did testify that he is employed as chief polygraph examiner for the State Bureau of Identification. [But] * * * The evidence here does not suggest a lie-detector test to the jury to the prejudice of defendant. The one witness volunteered that he was a polygraph examiner, but did not negate the fact that he was associated with the State Bureau of Identification and might do many other types of investigation. We have determined here that the evidence justified the verdict and judgment. Such a case will not be reversed for errors in the admission of evidence unless they are harmful. People v. Raymond, 296 Ill. 599, 130 N.E. 329. The error here, if any, is minor and certainly not reversible."
On the basis of an analysis of the cases hereinbefore discussed we conclude that while neither the results of a lie detector examination nor testimony which indirectly or inferentially apprises a jury of the results of a lie detector examination is admissible into evidence, the mere fact that the jury is apprised that a lie detector test was taken is not necessarily prejudicial if no inference as to the result is raised or if any inferences that might be raised as to the result are not prejudicial. This determination should not, of course, encourage attempts to introduce evidence concerning lie detectors. As is clear from the cited cases, such evidence is liable to be prejudicial and should be admitted only when clearly relevant and unmistakably nonprejudicial.
In the instant case the only reference made with respect to Johnson's "telling the truth" was with respect to his initial denial that he was at the scene of the incident. He subsequently recanted and admitted having been here. Thus, even if the jury speculated that the (inferred) lie detector examination "proved" he was initially lying this did not prejudice him.
In fine, were we to accept the pyramid of inferences appellant relies upon as having apprised the jury that he was examined by a polygraph operator and accept additional inferences apprising the jury of the results of the examination, we must nonetheless conclude that these inferences were not prejudicial in that they could lead to nothing more than a conclusion of an admitted fact, that appellant lied when he initially denied having been at the scene of the incident. Cf. Tyler v. United States, supra. Accordingly, the court did not err in receiving Allison's testimony and the judgment is affirmed.
Affirmed.
SHANNON, J., and SAMPLE, WALLACE, Associate Judge, concur.